UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JAMALL BAKER,

      Plaintiff,

 v.

JERALD GRANT, et al.,

      Defendants.

Case No. C17-1678-RSL-MAT

REPORT AND RECOMMENDATION

## INTRODUCTION

Plaintiff Jamall Baker, proceeding pro se and *in forma pauperis*, filed a 42 U.S.C. § 1983 civil rights action associated with his confinement in the Special Offender Unit at Monroe Correctional Complex (MCC).[1] His First Amended Complaint named Correctional Officer Jerald Grant, Correctional Sergeant Michael Clayton, and Unit Supervisor Jason Neely as defendants. (Dkt. 12.) Following consideration of plaintiff's Second Amended Complaint (Dkt. 24-2) and a motion to dismiss, the Court issued an Order providing for plaintiff's pursuit of First Amendment retaliation claims against Officers Grant and Neely and Eighth Amendment claims against Officer

---

[1] Plaintiff recently noted his transfer to MCC's Twin Rivers Unit. (Dkt 140 at 3, 19.)

REPORT AND RECOMMENDATION - 1

Grant and Sergeant Clayton, while dismissing all other claims and defendants. (*See* Dkts. 33 & 40.) Later, the Court dismissed plaintiff's retaliation claim against Grant and his Eighth Amendment claim against Clayton, leaving only plaintiff's retaliation claim against Neely and his Eighth Amendment claim against Grant remaining for consideration. (*See* Dkts. 66 & 72.)[2]

Defendants now move for summary judgment on the merits of plaintiff's two remaining claims and dismissal of this matter with prejudice. (Dkt. 127.) Plaintiff opposes the motion. (Dkt. 140.) The Court, for the reasons set forth below, finds defendants' motion should be GRANTED and this matter DISMISSED with prejudice.

## BACKGROUND

As previously outlined by the Court, plaintiff's operative complaint alleges:

> Plaintiff has been diagnosed with paranoid schizophrenia, paranoid personality disorder, schizoaffective disorder, and bipolar disorder. (Dkt. 24-2 at ¶¶ 2-3.) On countless occasions between 2014 and 2017, Officer Grant falsely announced to staff members that plaintiff has HIV/AIDS. (*Id.* at ¶¶ 24-25.) In April 2015, Officer Grant told an inmate that plaintiff was "HIV/AIDS positive" and a snitch from California who was in the witness protection program. (*Id.* at ¶¶ 7-8.) Officer Grant spread similar rumors among inmates at other times, too. (*Id.* at ¶¶ 57-58.)
>
> Plaintiff asked Officer Grant to stop spreading rumors about him or he would litigate. (*Id.* at ¶¶ 32-33.) Officer Grant responded, "So what, you are a paranoid schizophrenic, a judge will never believe you over me. . . . I don't care, do something while you can." (*Id.* at ¶¶ 33-34.) After plaintiff began to complain about Officer Grant's behavior, the officer told him that he would be transferred to another institution and away from his family if he continued to write grievances and file litigation regarding the alleged comments. (*Id.* at ¶¶ 10-13.) Officer Grant also instructed two inmates to threaten plaintiff with transfer if he continued to file grievances regarding the alleged comments and actions. (*Id.* at ¶ 14.)
>
> . . .

---

[2] The docket should be corrected to reflect the dismissal of Clayton as a defendant. The Court also notes that, while it previously found an evidentiary hearing necessary on the question of whether plaintiff exhausted his claim against Neely, defendants later waived their argument on exhaustion. (*See* Dkt. 114.)

REPORT AND RECOMMENDATION - 2

> In February 2017, plaintiff requested and was granted a meeting with Sergeant Clayton, Officer Grant, and Officer Neely. (*Id.* at ¶¶ 50-51.) During the meeting, plaintiff and Officer Grant discussed the claims in this action; Sergeant Clayton and Officer Neely were completely quiet. (*Id.* at ¶¶ 52-53.) Officer Grant agreed to stop spreading rumors about plaintiff having HIV/AIDS and being in witness protection. (*Id.* at ¶¶ 54-56.) Officer Grant, however, did not stop. (*Id.* at ¶¶ 57-58.)
>
> On April 7, 2017, Officer Neely placed plaintiff in administrative segregation because plaintiff filed a personal restraint petition about Officer Grant. (*Id.* at ¶¶ 59, 61.) Officer Neely told plaintiff, "Since you like writing grievances and complaints, I'm sending you to the hole. Write your complaints from there." (*Id.* at ¶ 64.) Officer Neely fabricated another explanation to justify his actions. (*Id.* at ¶¶ 60, 62, 63.) While plaintiff was in administrative segregation, he lost his job in the inmate kitchen. (*Id.* at ¶ 65.)
>
> Plaintiff "suffered emotionally" as a result of Officer Grant's rumors regarding HIV/AIDS and the witness protection program. (*Id.* at ¶¶ 16, 19.) Officer Grant's threats made it very difficult for plaintiff to move forward with grievances and litigation against the officer. (*Id.* at ¶ 18.) Also as a result of Officer Grant's actions, plaintiff was placed in administrative segregation and lost his job in the inmate kitchen; ultimately, he was moved to a unit that houses more severe cases of mental illness. (*Id.* at ¶ 20.) Plaintiff also "broke down," losing approximately 40 pounds. (*Id.* at ¶ 42.) He also stopped spending time in the dayroom. (*Id.* at ¶ 75.). . .

(Dkt. 33 at 2-4 (addressing Dkt. 24-2); *see also* Dkt. 66 at 2-4.)

As reflected above, two claims remain pending in this matter. First, plaintiff alleges retaliation by Officer Neely for placing him in administrative segregation because plaintiff filed a lawsuit against Officer Grant. Second, plaintiff alleges violation of the Eighth Amendment by Officer Grant through the spreading of rumors that plaintiff has HIV/AIDS and is a snitch. (Dkt. 40 at 1; Dkt. 33 at 6-7, 9-11, 14.)

Plaintiff provides declarations in support of his claims. Inmate Jason Smith attests Officer Grant told him, first, that plaintiff had a "contagious infectious disease[,]" then that plaintiff has "a common disease", and, finally, that plaintiff had "[sickle] cell", which "did not make very much sense" given that "sickle cell is not contagious or infectious communicable [sic]." (Dkt. 140 at

REPORT AND RECOMMENDATION - 3

78.) Smith also attests Grant told him plaintiff was a "snitch." (*Id*.)  Inmate Christopher White attests to overhearing Smith tell plaintiff about Grant's statements. (*Id*. at 80.)  White also attests Grant told him, in March 2017, "'I read inmates medical records, and they have all kinds of diseases.'" (*Id*. at 82.)  Inmate Benjamin Riley, plaintiff's former cell-mate, attests plaintiff lost a "huge" amount of weight between 2015 and 2017, at one point worrying about falling below 175 pounds, had to exchange clothing sizes, and experienced stress, anxiety, depression, and symptom exacerbation due to rumors about him. (*Id*. at 54-55.)  Riley also attests correctional officers read inmate medical files, which are left out in the open for viewing, and describes an incident in which he observed a nurse show an inmate's file to a female correctional officer. (*Id*. at 85-86.)  Finally, inmate Daniel Perez attests that, on March 22, 2019, he saw a manila envelope with plaintiff's name sitting on an officer's desk, which plaintiff later picked up and discovered was unsealed and contained confidential medical records. (*Id*. at 76.)

Defendants provide their own declarations and documentation.  Officer Grant states he began work in the MCC Special Offender "F Unit" then housing plaintiff beginning February 1, 2015. (Dkt. 128, ¶4.)  He denies he referred to plaintiff as a snitch, indicated plaintiff had an infectious disease, or targeted plaintiff for harassment. (*Id*., ¶5.)  Grant also denies he or other correctional officers have access to inmate personal medical file information, stating they would be afforded, at most, limited information regarding an inmate's medical diagnosis or treatment if necessary for housing security. (*Id*., ¶3.)  Officer Neely states he began work in the F Unit as a Correctional Mental Health Unit Supervisor on October 3, 2016. (Dkt. 129, ¶¶4-5.)  He attests he learned of plaintiff's reports of ongoing issues with Grant shortly after beginning work on the unit, found no evidence to support plaintiff's complaints, but arranged for Grant to work primarily apart from plaintiff to minimize their contact. (*Id*., ¶¶5-6.)  Neely also attests he later placed plaintiff in

REPORT AND RECOMMENDATION - 4

Administrative Segregation because plaintiff's "focus and level of agitation against Officer Grant continued to escalate" and to ensure safety of staff and other inmates. (*Id*., ¶7.) During plaintiff's fourteen-day stay in segregation, Neely arranged and coordinated plaintiff's transfer to MCC's "E Unit." (*Id*., ¶¶8-9.) Neely denies the E Unit has more restrictions than the F Unit or that plaintiff's transfer had anything to do with plaintiff's pursuit of litigation relating to Grant. (*Id*., ¶9.)

MCC records show plaintiff's placement in Administrative Segregation on April 7, 2017 and his release and transfer to the E Unit on April 21, 2017. (*Id*., Ex. A.) Neely identified "Threat to Others" and "Threatening Staff" as the basis for the referral to segregation, described plaintiff's "acute symptoms of his [mental health diagnosis] which resulted in a threat to staff safety", and bexplained:

> Mr. Baker has demonstrated a pattern of increased focus followed by agitation towards a specific staff member. Mr. Baker believes that this staff is working against him. This pattern has existed for an extended period of time and Mr. Baker has previously been able to manage his experience. At present, efforts to disrupt his thoughts have been unsuccessful and Mr. Baker continues to express anger and frustration towards this staff. In an effort to maintain staff safety, ad-seg is recommended.

(*Id*., Ex. A at 1-2.) State court records show plaintiff had filed the personal restraint petition relating to Grant several months earlier, on January 4, 2017, and plaintiff's voluntary motion to dismiss that petition on April 24, 2017. (Dkt. 130 (Patty Willoughby Decl.), ¶3 and Ex A.)

MCC mental health records show plaintiff's diagnosis of Paranoid Personality Disorder and document years of paranoid thoughts, including perceptions that both correctional officers and other inmates were looking at him, talking about him, and taking actions against him, and his struggle to differentiate between his paranoia and reality. (Dkt. 131 (Jennifer Lea Decl.), ¶4 and Ex. B.) In a record dated April 7, 2017, plaintiff discussed, with a mental health counselor and in the presence of Sergeant Clayton, his "suspicions of Officer Grant causing [him] continuous

REPORT AND RECOMMENDATION - 5

problems." (Dkt. 131-2 at 45.) Plaintiff's anger heightened as he continued to talk and he exhibited loud speech, angry affect, paranoid thought process, and "thoughts of harm to others." (*Id*.) The counselor stated: "Due to Mr. Baker['s] current presentation that included vehement anger towards Officer Grant, and a comment relayed from another inmate about Mr. Baker doing harm to Officer Grant lead to Mr. Baker's subsequent transfer to seg." (*Id*.) A May 22, 2017 yearly mental health update also addresses plaintiff's allegations against Grant and depicts plaintiff's transfer as resulting from plaintiff's threats towards Grant. (Dkt. 131-2 at 286 ("For some time Mr. Baker has been focused on an F-Unit officer who he believed was 'messing with' him by telling other inmates that he has AIDS, and directing odd looks and negative comments toward him. A few weeks ago there were reports that Mr. Baker had threatened this officer, at which point he was moved to ad-seg and is now being transferred to E unit to protect the officer in question.")) The assessment identifies plaintiff's primary struggle as "paranoia and his angry response to perceived threats[,]" with paranoia "triggered by a look or an off-handed comment" and leading to verbal escalation, and plaintiff's treatment to focus on "paranoid symptoms and continued reality checking." (*Id*. at 286-89.)

Other medical records show plaintiff's weight varying by some sixteen pounds during the relevant time period. (Dkt. 131, ¶3 and Ex. A.) Plaintiff, for example, weighed 217 pounds in June 2014, 206 pounds in August 2015, 201 pounds in July 2016, 210 pounds in March 2017, and 215 pounds in December 2017. (*Id*., Ex. A.) Records also show that, following his April 2017 transfer to the E Unit, plaintiff continued to receive mental health treatment and continued to work until at least October 2017. (*See* Dkt. 131-2 at 4-37.) Plaintiff also continued to report paranoia that officers were looking at and plotting against him, his perception of ongoing retaliation, his issues getting along with co-workers, and paranoia affecting his relationships with other offenders,

REPORT AND RECOMMENDATION - 6

including an incident in which he "'thought everyone was calling me a rat[,]" resulting in his need to "'take some time off of work and clear my head.'" (*See, e.g., id*. at 12-13, 19, 22, 28, 30, 32, 36-37; *see also* Dkt. 60-3 (grievances and other documents addressing plaintiff's work-related issues following his transfer).)

## DISCUSSION

To sustain a § 1983 civil rights claim, plaintiff must show (1) he suffered a violation of rights protected by the Constitution or created by federal statute, and (2) the violation was proximately caused by a person acting under color of state or federal law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To satisfy the second prong, plaintiff must allege facts showing how individually named defendants caused or personally participated in causing the harm alleged in the complaint. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981).

A.   Summary Judgment Standard

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the district court "there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. The moving party can carry this burden by producing affirmative evidence negating an essential element of the nonmovant's case, or by establishing the nonmovant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The

1 burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). A mere scintilla of evidence does not suffice to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the nonmoving party rely on allegations in the complaint or unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

B.    First Amendment

The First Amendment protects prisoners' right to file grievances and pursue civil rights litigation in federal court without retaliation. *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir.

2012); *Silva v. DiVittorio*, 658 F.3d 1090, 1104 (9th Cir. 2011). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

"The prisoner must show that the type of activity in which he was engaged was constitutionally protected, that the protected conduct was a substantial or motivating factor for the alleged retaliatory action, and that the retaliatory action advanced no legitimate penological interest." *Quiroz v. Horel*, 85 F. Supp. 3d 1115, 1124 (N.D. Cal. 2015) (citing *Hines v. Gomez*, 108 F.3d 265, 267-68 (9th Cir. 1997)); *see also Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) (plaintiff bears burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains). Additionally, "a plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm." *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009).

Plaintiff alleges Officer Neely placed him in administrative segregation and transferred him to another unit because he filed a personal restraint petition about Officer Grant. He maintains Neely fabricated a reason for his actions. He also contends he lost his job in the inmate kitchen while he was in administrative segregation.

Neely referred plaintiff to administrative segregation and arranged for his transfer some three months after plaintiff filed a personal restraint petition associated with Grant. Plaintiff does not contend the state court filing involved or related to Neely or explain why the filing against Grant would have prompted Neely to later retaliate. He presents no evidence supporting a

REPORT AND RECOMMENDATION - 9

contention his engagement in protected activity was a factor, let alone a substantial or motivating factor, in the alleged retaliatory action.

Moreover, both documentation completed by Neely and plaintiff's mental health records contemporaneous with the referral and transfer document a legitimate penological objective of ensuring the safety of Grant and others.  (*See, e.g.*, Dkt. 129, Ex. A ("Administrative Segregation Referral and Reviews" by Neely recommending administrative segregation to maintain staff safety based on pattern of "increased focus followed by agitation towards a specific staff member[]" and unsuccessful efforts to disrupt those thoughts; noting "plan developed to ensure for staff safety" and plaintiff's move to E Unit); Dkt. 131-2 at 45 (April 7, 2017 notes from mental health counselor Keith Toyoda: "Due to Mr. Baker's current presentation that included vehement anger towards Officer Grant, and a comment relayed from another inmate about Mr. Baker doing harm to officer Grant lead to Mr. Baker's subsequent transfer to seg."))  While plaintiff denies he threatened Grant, he concedes he was emotional and angry (Dkt. 140 (Jamall Baker Decl.) at 14-15, ¶¶3, 6), providing support for the existence of a legitimate penological objective for the actions taken.

There is, in sum, no issue of material fact or significant, probative evidence supporting a nexus between a protected activity and the alleged retaliatory actions.  Plaintiff's contention Neely took adverse actions against him because of his filing against Grant is conclusory, contradicted by the evidence of record, and subject to dismissal on summary judgment.

C.     Eighth Amendment

To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  Although prison conditions may be restrictive and harsh, prison officials must provide prisoners with food, clothing, shelter, sanitation, medical care, and personal

REPORT AND RECOMMENDATION - 10

safety. *Id.*; *Toussaint v. McCarthy*, 801 F.2d 1080, 1107 (9th Cir. 1986); *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982).

Where a prisoner alleges injuries stemming from unsafe conditions, prison officials may be held liable only if they acted with "'deliberate indifference' to a substantial risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). The deliberate indifference standard involves an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious." *Farmer*, 511 U.S. at 834. Second, the prison official must "know of and disregard an excessive risk to inmate health or safety." *Id.* at 837. Thus, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 835. Mere negligence on the part of a prison official is not sufficient to establish liability; the official's conduct must have been wanton. *Id.*; *Frost*, 152 F.3d at 1128; *see also Daniels v. Williams*, 474 U.S. 327, 333 (1986).

Plaintiff alleges violation of the Eighth Amendment by Officer Grant through several years of verbal harassment, including stating plaintiff has HIV/AIDS and is a snitch. Plaintiff alleges these comments caused him to break down, suffer constant mental anguish, lose some forty pounds, and resulted in his transfer to more restrictive housing and the loss of his kitchen job.

As a general matter, verbal harassment, abuse, or threats do not violate the Eighth Amendment. *Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996) ("[V]erbal harassment generally does not violate the Eighth Amendment."), *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998); *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987) ("[I]t trivializes the eighth amendment to believe a threat constitutes a constitutional wrong."); *Oltarzewski v. Ruggiero*, 830

REPORT AND RECOMMENDATION - 11

1  F.2d 136, 139 (9th Cir. 1987) ("'[V]erbal harassment or abuse . . . is not sufficient to state a

2  constitutional deprivation under 42 U.S.C. § 1983.'") (quoted source omitted). *See also Somers v.*

3  *Thurman*, 109 F.3d 614, 622 (9th Cir 1997) ("We are mindful of the realities of prison life, and

4  while we do not approve, we are 'fully aware that the exchange of verbal insults between inmates

5  and guards is a constant, daily ritual observed in this nation's prisons.'") (quoted source omitted).

6  Accordingly, allegations of "'disrespectful and assaultive comments'" do not suffice to withstand

7  a motion for summary judgment. *Keenan*, 83 F.3d at 1092.  A plaintiff must present "evidence

8  that these comments were unusually gross even for a prison setting and were calculated to and did

9  cause him psychological damage." *Id*.

10  The declarations submitted by plaintiff provide support for his contention correctional

11  officers are, as a general matter, able to access inmate medical information, as well as Grant's

12  statements he knew about such information.  They do not demonstrate Grant, in fact, had access

13  to or knowledge of plaintiff's personal medical information or any involvement in a witness

14  protection program.  The declarations do, on the other hand, set forth a dispute of fact as to whether

15  Grant told other inmates plaintiff had a "contagious infectious disease" and was a "snitch."  (*See*

16  Dkt. 140 at 54-55, 78, 80-82.)  Yet, even taking those allegations as true, the Court finds defendants

17  entitled to summary judgment.

18  The verbal harassment, while clearly objectionable, does not suffice to establish a violation

19  of the Eighth Amendment.  Plaintiff must, as stated above, present evidence that comments

20  unusually gross even for a prison were calculated to and caused him psychological damage.

21  *Keenan*, 83 F.3d at 1092.  Here, the evidence of psychological damage and other harm resulting

22  from harassment by Grant is muddled and insufficient to establish a constitutional violation.

23  Plaintiff's mental health records show his long struggle with paranoid thoughts other

REPORT AND RECOMMENDATION - 12

inmates and correctional officers were looking at him, talking about him, and taking adverse action against him, and his difficulty differentiating between reality and his paranoia. (*See* Dkt. 131, Ex. B.) Grant is only one among many people plaintiff believed to be causing him harm and plaintiff's perceptions at times differed from reality. (*See, e.g.,* Dkt. 131-2 at 286 (May 2017: "For example, Mr. Baker overheard an officer telling an inmate porter about the importance of taking out the garbage 'so the rats don't get into it,' and interpreted the comment as a personal insult implying that Mr. Baker himself was a rat. Even in a therapy session a couple of weeks later, Mr. Baker reflected that the officer might not have been talking about him at all, but immediately suggested, 'He might've been talking about [another officer] instead!'"; "Mr. Baker urgently relayed on multiple occasions, 'I haven't been pat-searched in years. No one will touch me. Guys I used to hang out with won't even say hi to me anymore.' Upon inquiry, mental health staff was told that each inmate is pat-searched each time they leave the kitchen after a shift, and Mr. Baker was seen frequently joined for conversation by many people at his dayroom workstation."); *id*. at 290 (October 2016: "There are seldom days when Mr. Baker does not approach a mental health staff with complaints about a custody officer or another inmate stating that he thinks that he is being singled out and targeted with ill and harmful intentions."); *id*. at 302 (August 2015: "He presents with extreme paranoia and reports that he hears voices that tell him that others are out to harm him. At times he interprets completely innocuous statements as having hidden implications directed at him. He sees implied intentions in every look that is cast his way by staff or offenders."))

The records also show similar thoughts and allegations both before Grant's assignment to the F Unit (*id*. at 176, 180-81) and after plaintiff's transfer to the E Unit (*see, e.g., id*. at 3, 12-13, 26, 32, 36). Plaintiff, for example, reported an incident "where I thought everyone was calling me a rat" in June 2017, months after his transfer. (*Id*. at 36.) In March 2017, not long before the

REPORT AND RECOMMENDATION - 13

1  transfer, plaintiff reported being told by another inmate, "'Your brother has AIDS'", and presented

2  with paranoid thought content, potential delusions, and "struggling with increased paranoia." (*Id*.

3  at 51.)

4        The declarations submitted by plaintiff do not attribute psychological damage suffered by

5  plaintiff to statements made by Grant. For instance, while attesting to plaintiff's weight loss and

6  stress, anxiety, and depression over rumors spread about him, Riley does not identify Grant as the

7  source of the rumors or reason for plaintiff's issues. (*See* Dkt. 140 at 54-55.) Further, MCC

8  medical records do not show the weight loss alleged. (*See* Dkt. 131, Ex. A.) As discussed above,

9  plaintiff's referral to administrative segregation and transfer, while related to his issues with Grant,

10 resulted from a determination plaintiff had threatened Grant and posed a risk to the safety of staff

11 and other inmates. There is, moreover, no evidence supporting plaintiff's allegation the E Unit

12 constitutes more restrictive housing and the evidence shows plaintiff continued to receive mental

13 health treatment and continued to work following his transfer (*see id*., Exs. A-B). Plaintiff, in sum,

14 does not set forth a genuine issue of material fact or present significant and probative evidence

15 supporting an Eighth Amendment violation through verbal harassment by Grant.

16       The Eighth Amendment duty to provide for a prisoner's personal safety also extends to

17 protecting the prisoner from violence at the hands of other prisoners. *Farmer*, 511 U.S. at 833-34.

18 To establish a violation of that duty, a prisoner must establish prison officials were deliberately

19 indifferent to a serious threat to the inmate's safety. *Id*. Here, plaintiff does not allege in his

20 second amended complaint that he faced a threat to his personal safety by other prisoners because

21 Grant publicly referred to him as a snitch. *Compare Valandingham v. Bojorquez*, 866 F.2d 1135,

22 1138-39 (9th Cir. 1989) (finding summary judgment improper where prison officials called a

23 prisoner a "snitch" in the presence of other inmates with the intent of having the prisoner killed,

REPORT AND RECOMMENDATION - 14

resulting in threats of harm by other inmates), *with Morgan v. MacDonald*, 41 F.3d 1291, 1293-94 (9th Cir. 1994) (denying a similar claim where the prisoner did not allege he was actually subjected to retaliation by fellow inmates, or that the defendant was aware statements exposed the plaintiff to substantial risk of serious harm).  Plaintiff, instead, alleged Grant retaliated against him by threatening him with a transfer to another institution if he continued to file grievances or complain, and by instructing two other inmates to tell plaintiff he would be transferred if he continued to file paperwork concerning Grant.  (*See, e.g.*, Dkt. 24-2 ¶¶ 12-14, 18, 41, 89.)  Any conclusory and generalized allegations of threats and fear in the pleading, and any assertions included only in responsive briefing and unaccompanied by evidentiary support, do not suffice to prevent dismissal on summary judgment.  (*See, e.g.*, Dkt. 140 at 10, 13 (asserting he had to fight another inmate who said he would "kick me to death if I did not stay away from him because I had AIDS.")  For this reason, and for the reasons stated above, plaintiff's Eighth Amendment claim against Officer Grant should be dismissed.

## CONCLUSION

The Court recommends Defendants' Motion for Summary Judgment (Dkt. 127) be GRANTED and plaintiff's remaining claims and this matter be DISMISSED with prejudice.  A proposed order accompanies this Report and Recommendation.

## OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within

REPORT AND RECOMMENDATION - 15

1  **fourteen (14)** days after service of objections. If no timely objections are filed, the matter will be
2  ready for consideration by the District Judge on **July 24, 2020**.

3  Dated this 1st day of July, 2020.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION - 16